No. 105,601

STATE OF KANSAS, *Appellee*, v. JUAN LOPEZ, *Appellant*.

(323 P.3d 1260)

Opinion filed May 9, 2014.

*Michael G. Highland*, of Bonner Springs, argued the cause and was on the brief for appellant.

*Edmond D. Brancart*, chief deputy district attorney, argued the cause, and *Jennifer L. Myers*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Juan Lopez directly appeals from his jury convictions for two counts of premeditated first-degree murder and one count of fleeing or attempting to elude a police officer. The State alleged that Lopez drove the vehicle from which his codefendant, Eldier Molina, shot and killed two rival gang members in another car. Lopez challenges the sufficiency of the evidence on two bases: (1) The eyewitness identification witnesses were unreliable; and (2) there was no evidence Lopez possessed the requisite premeditated intent to kill the victims when he aided and abetted Molina. Lopez also raises two issues regarding the imposition of a life sentence pursuant to K.S.A. 21-4635 with a mandatory minimum term of 50 years (hard 50), to-wit: (1) The district court erroneously considered irrelevant information about a previous murder trial in which Lopez was acquitted; and (2) the district court improperly weighed the statutorily prescribed aggravating and mitigating circumstances before imposing the hard 50 sentence. We affirm.

## FACTUAL AND PROCEDURAL OVERVIEW

On the evening of November 13, 2009, two Kansas City, Kansas, police officers, Jason Pittman and Darrell Forrest, were in a marked patrol car, following a vehicle pursuant to an unrelated drug investigation. While stopped at the intersection of 18th and Central, Officer Pittman saw a silver Honda drive into the oncoming lane to pull alongside a black sedan, placing the Honda's passenger side next to the sedan's driver side. The officer heard several gunshots fired in quick succession and saw a muzzle flash coming from a gun that was extended out of the open passenger side window of the Honda. The shots hit and killed two occupants of the sedan, Gerson Diaz-Turcios and Jose Diaz-Turcios, who were brothers and ostensibly members of the Florence (F13) gang.

After the shooting, the Honda proceeded through the intersection in front of the officers, who had activated the patrol car's lights and siren. Officer Pittman would testify that he saw the Honda's driver well enough that he could see the driver mouth a scatological expletive. The officers gave chase and were joined by other pursuing officers until the Honda came to a dead end near a wooded area. The driver and front-seat passenger fled afoot, while the backseat passenger, later identified as 12-year-old Max Palomino, surrendered to the police.

The front-seat passenger, later identified as Molina, was tracked by a trained canine to a residence where he was found face down on the ground underneath a deck. The driver eluded capture that evening. But early the next morning, Palomino told a detective that Lopez was driving the Honda and Molina was the shooter. Officer Pittman, upon learning from the detective that Lopez was involved, located a police photograph and positively identified Lopez as the person he saw driving the Honda at the scene of the shooting.

The State charged Molina and Lopez with premeditated first-degree murder for the killings of the Diaz-Turcios brothers. Molina was also charged with criminal possession of a firearm, and Lopez was charged with fleeing or attempting to elude a police officer. They were tried together, and both were convicted on all counts.

Palomino testified at trial that Molina and Lopez were members of the Surenos Por Vida (SPV) gang with whom he associated, albeit he was not a member. On the night of the incident, Palomino accompanied Molina and Lopez, who were en route to a gang meeting in the Honda. They stopped for gasoline at 18th and Grandview, where they encountered five members of the rival F13 gang. Palomino testified at trial that he watched from inside the Honda as Molina and Lopez argued with the F13 gang members. He admitted that in his initial statement to the police he had lied about exiting the Honda to pump gasoline.

Palomino related that when they left the station with Lopez driving the Honda, the vehicle containing the F13 gang members (F13s) followed. Palomino suspected that Molina and Lopez had told the F13s to follow them. At some point, Lopez turned one way and the F13s' car went the other way; Lopez made a U-turn

and ended up right behind the F13s at the 18th and Central stop-light. At that point, Lopez drove alongside the F13s' vehicle to allow Molina to shoot from the Honda's passenger seat into the driver's side of the F13s' vehicle. Palomino testified that Molina fired three rounds at the F13s before Lopez "peeled out" and proceeded through the intersection.

Palomino testified that he believed Lopez knew the drive-by shooting was going to occur. He based that belief on his own knowl-edge that someone was going to get shot after he saw the SPV gang members encounter the rival F13 gang members at the gasoline station and observed that Molina had a handgun. He related that everyone in the SPV gang knows that if an SPV runs into an F13, the SPV is expected to either fight the F13 or shoot the rival if a firearm is available. He further related that the F13 gang members are expected to shoot someone on a Friday the 13th, which was the day and date of this occurrence. Accordingly, Palomino said, "[W]e were out that day trying to see if we can catch somebody."

On the other hand, Palomino admitted he initially told police he thought that he, Molina, and Lopez were just going to drive around and he did not know they were going to shoot anyone. Further, on cross-examination at trial, Palomino contradicted his direct testi-mony by saying that until the shooting occurred, he did not see the gun and he thought the three of them were only going to fist-fight with the F13s.

The State presented a surveillance videotape from the gasoline station that corroborated some of Palomino's testimony. Although the videotape has not been included in the record on appeal, we do have some discussion of the videotape by the witnesses. Those witnesses clearly put the Honda at the 18th and Grandview gaso-line station, although the faces of Molina and Lopez were not dis-played on the recording. The evidence did depict two men talking to the F13 group and then getting back into the Honda, who were identified by Palomino as Molina and Lopez. Further, Detective Mike Lucas testified that he could identify the two victims as being on the videotape from the station.

Molina testified on his own behalf. He admitted he was a mem-ber of the SPV gang and he knew Palomino through Palomino's

older brother. But Molina denied that he had ever been in the Honda on that day or that he had been involved in any manner with the drive-by shooting. Instead, he related an alibi scenario that placed him in the vicinity of his apprehension with marijuana in his pocket. He said the presence of police in the area prompted him to hide under the deck to avoid being caught with the drugs. Molina's girlfriend, Sandra Rueda, and her 16-year-old sister corroborated portions of Molina's alibi.

Lopez did not present any evidence in his defense. The jury convicted Molina and Lopez as charged. The district court imposed a hard 50 sentence for Lopez' first count of first-degree murder and a hard 25 sentence for the second count, to run consecutively. The district court also sentenced Lopez to 6 months for fleeing or attempting to elude a police officer, to run concurrent with the first count. Lopez filed a timely appeal. This court has jurisdiction over Lopez' appeal under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed).

## SUFFICIENCY OF THE EVIDENCE

As noted, Lopez makes two sufficiency of the evidence challenges. First, he attacks all of his convictions by contending Officer Pittman and Palomino provided such unreliable testimony that no rational jury could have based any conviction on that evidence and there was no other evidence presented to even place Lopez in the Honda. Second, with respect to the premeditated first-degree murder convictions, Lopez argues the State presented no evidence, either direct or circumstantial, that Lopez knew Molina was going to shoot the victims.

### Standard of Review

"When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Harris*, 297 Kan. 1076, 1081, 306 P.3d 282 (2013) (citing *State v. Qualls*, 297 Kan. 61, Syl. ¶ 1, 298 P.3d 311 [2013]).

*Analysis*

  *Driver of the Honda*

Lopez first contends there were only two items of evidence that placed Lopez behind the wheel of the Honda during the shooting: Officer Pittman's eyewitness identification and Palomino's accomplice testimony. Lopez argues both witnesses were so unreliable that we must ignore their testimony in assessing evidence sufficiency. To clarify, Lopez does not argue that the district court should have performed the gatekeeping function of excluding Officer Pittman's eyewitness identification testimony because of a substantial likelihood of misidentification. *Cf. State v. Corbett*, 281 Kan. 294, 304-06, 130 P.3d 1179 (2006) (considering whether eyewitness identification should have been excluded from jury consideration). Rather, in essence, Lopez asks us to find that the jury in this case was simply incorrect in its assessment of witness credibility. We decline that invitation.

To review, Officer Pittman testified the Honda slowed as it went through the intersection in front of the patrol car; the officer saw the driver's face turn toward the patrol car and mouth, "Oh, shit"; and the officer could positively identify Lopez as the Honda's driver. Lopez points out that Officer Pittman's written report did not mention those important facts, *i.e.*, that the Honda slowed down, that the officer saw the driver's face, or that the driver mouthed an expletive. Further, Officer Pittman's partner, Officer Forrest, who was a passenger in the patrol car, testified that the Honda sped through the intersection at a high rate of speed and that he was unable to identify the driver. Lopez also points out that Officer Pittman was occupied with driving the patrol car and activating the emergency lights, whereas Officer Forrest would not have had those distractions.

Lopez outlines some very good arguments to present to the jury. Indeed, those arguments were made to Lopez' jury after defense counsel had zealously cross-examined the State's witnesses. Now, Lopez asks us to declare Officer Pittman an unreliable witness as a matter of law. Neither inconsistent statements nor conflicting testimony supports such a result. To the contrary, we trust juries

to resolve those credibility and weighting questions. *Corbett*, 281 Kan. at 306 ("juries have the knowledge and experience to determine the reliability of an eyewitness identification"). In *Corbett*, we approvingly quoted *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977):

" 'We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.' " *Corbett*, 281 Kan. at 305.

Likewise, Lopez' unreliability challenge to Palomino's testimony would require this court to invade the province of the jury. Lopez points to Palomino's admission that he lied to the police about some of the superfluous details of the incident, such as his whereabouts before joining Lopez and Molina in the Honda and whether he exited the Honda at the gasoline station. Pointedly, the critical facts of both accounts did not change, such as Palomino's presence in the Honda and Lopez' role as driver. But regardless of the relevancy of the inconsistencies between a witness' statements to law enforcement interviewers and his or her trial testimony, the procedural mechanism for testing how those inconsistencies impact the witness' credibility is through cross-examination. *Cf. Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (Confrontation Clause guarantees procedural right to assess reliability "by testing in the crucible of cross-examination"). Here, defense counsel took full advantage of defendant's procedural right to test the reliability of Palomino's testimony in the crucible of cross-examination. Then, it was up to the jury to assess Palomino's credibility and to assign the weight to be given to his trial testimony.

Lopez appears to suggest that his case is different from the many others involving a witness' prior inconsistent statement because there was a lack of forensic or video evidence to support Palomino's statements. Lopez cites to no authority to support the notion that an accomplice's testimony requires corroborating physical or visual evidence. Perhaps that omission is because there is no such precedent. To the contrary, even the "uncorroborated testimony of an

accomplice is sufficient to sustain a conviction." *State v. Bey*, 217 Kan. 251, 260, 535 P.2d 881 (1975); see *State v. Mclaughlin*, 207 Kan. 594, 598, 485 P.2d 1360 (1971). Moreover, in this case, there was evidence to corroborate much of Palomino's version of events, including the gasoline station videotape and Officer Pittman's identification of Lopez as the driver.

In conclusion, we refuse to second guess the jury by reassessing witness credibility, resolving conflicting testimony, or reweighing the evidence. Viewed in the light most favorable to the State, the evidence was sufficient for a rational jury to determine that Lopez was driving the Honda during the drive-by shooting.

### Premeditation

Lopez also claims that the State failed to meet its burden of proving beyond a reasonable doubt that he premeditated the two murders. He was prosecuted on an aiding and abetting theory based upon his role as the driver of the Honda from which Molina shot and killed the victims. Nevertheless, we have clarified that, even on an aiding and abetting theory of criminal responsibility, the State must prove that the defendant "possessed the specific intent of premeditation in order to convict [the defendant] of first-degree murder." *State v. Trussell*, 289 Kan. 499, 503, 213 P.3d 1052 (2009) (citing *State v. Overstreet*, 288 Kan. 1, 11, 200 P.3d 427 [2009]; *State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 [2005]).

Lopez points to that portion of Palomino's testimony where he said he thought the SPVs were merely going to fistfight the F13s, apparently suggesting Lopez would have had the same belief. But, of course, Palomino was not privy to the conversation between the SPVs and F13s at the gasoline station or any discussion between Molina and Lopez. Given that Lopez did not testify, we do not know what he believed to be the plan.

Further, Lopez criticizes the lack of any direct testimony about prior discussions that may have occurred about the proposed shooting or about any threats that may have been exchanged by the respective gang members. He seems to intimate that the State must present direct evidence that the defendant thought over the matter

beforehand. But we have "noted that direct evidence of premeditation is rare." *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011). "Unless a person actually communicates his or her reasons for taking another's life, evidence of premeditation must be proved by circumstantial evidence. Such evidence, however, is sufficient to establish even the gravest offenses . . . ." *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 (2002).

In some cases, this court has looked at certain factors to aid in determining whether the evidence gives rise to an inference of premeditation. Those factors include: "(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *Qualls*, 297 Kan. at 66-67 (citing *State v. Scaife*, 286 Kan. 614, 617-18, 186 P.3d 755 [2008]). While use of a deadly weapon alone is insufficient to establish premeditation, "in some cases one factor alone may be compelling evidence of premeditation." *Qualls*, 297 Kan. at 67.

Here, the jury heard Palomino describe the animus existing between the rival gangs to which Lopez and the victims belonged and that, especially on a Friday the 13th, they were inclined to shoot at each other. He further described how the gangs had a confrontation at the gasoline station, after which they followed each other in their respective vehicles until Lopez drove the Honda into a position in the wrong lane of traffic that gave his partner a shooting lane at the victims. One would expect that if the goal was to engage in a fistfight, the Honda would have blocked the forward progress of the victims' vehicle to force them to exit their vehicle. A jury would have been justified in drawing the same inference to which Palomino testified, *i.e.*, Lopez knew exactly what he was doing when he pulled the Honda alongside the victims' car. He was executing a premeditated plan to shoot and kill the victims.

Reiterating, this court does not resolve conflicts in the evidence or pass on the credibility of witnesses. See *Harris*, 297 Kan. at 1081. Viewing the evidence in a light most favorable to the State, a ra-

tional factfinder could have found beyond a reasonable doubt that Lopez acted with a premeditated intent to kill.

### EVIDENCE OF DEFENDANT'S PRIOR ACQUITTAL

As noted, the district court imposed a hard 50 life sentence on one of the murder convictions. "To impose the hard 50 sentence, the district court must find one or more of the aggravated circumstances enumerated in K.S.A. 21-4636 exist and that the aggravating factors are not outweighed by any mitigating factors. K.S.A. 21-4635(d)." *State v. Nelson*, 291 Kan. 475, 486, 243 P.3d 343 (2010). Here, the district court found the aggravating circumstance set forth in K.S.A. 21-4636(b), *i.e.*, the defendant "knowingly or purposely killed or created a great risk of death to more than one person." Lopez does not challenge that finding, but he complains the sentencing court considered another homicide case in which he was acquitted as part of the weighing analysis.

Lopez' arguments are based on the following exchange:

"MS. WASSON [Prosecutor]: . . . This defendant is known to this court, not only because of his criminal history but because two weeks prior to this offense he was acquitted in this court of another homicide.

"MR. HIGHLAND [Lopez' Counsel]: Relevance, Judge. I don't think that's relevant at all. If he was acquitted, it shouldn't even be brought up today for sentencing purposes. I know this is the court it took place in—

"MS. WASSON: Your Honor, it dovetails with my arguments concerning the danger he poses to the community. And perhaps I'm mixing this up too much. I realize it doesn't go directly to the Hard 50 factor. But if, for instance—and, again, I have to speculate to some degree—if Mr. Highland is going to argue that his minor involvement indicates a violent nature of something, then I think it is relevant. So I guess I'll reserve and wait to hear Mr. Highland's argument.

"THE COURT: Well, I think we all know that I know that the jury in that case had certain evidence that indicated Mr. Lopez was the shooter in a gang-related situation that resulted in the death of one child and the wounding of another. And we know that there was testimony that said he was the shooter. It was by virtue of a deposition, because the witness didn't appear at the jury trial, but I found that the deposition was admissible. The jury in that case, again, under our system, was required to agree unanimously on guilt beyond a reasonable doubt. And regardless of the State's evidence that inculpated Mr. Lopez, the jury found him not guilty. So I recall all of that.

"MS. WASSON: Judge—

"THE COURT: So I, I overrule the objection but I, as to relevance, but I sustain it as to any implication you thought Ms. Wasson was giving me that Mr. Lopez was guilty. He was found not guilty.

. . . .

"MS. WASSON: Judge, I don't mean to interrupt. I guess I—and if I'm mistaken, please let me know—but I guess I'm in the position where I'm arguing for the sentence. And that would include—well, aside from Hard 50, it would include factors such as to why the defendant poses a danger to the community. So that was the reason I brought it up. And if it was at all improper, I apologize and withdraw the comment.

"THE COURT: I'm fine with it. I've overruled the relevance objection."

Later in the sentencing hearing, the prosecutor reiterated that she did not mention the prior acquittal because she thought it constituted an aggravating factor. She explained that she only mentioned the case because she thought it was relevant to whether Lopez' conduct in the current case was minor and because it was relevant to Lopez' "knowledge of what happens when his gang goes driving around looking for people in cars."

On appeal, Lopez continues to argue that "[d]efendant's acquittal of a previous charge, even a previous charge of murder, has zero probative value at sentencing and even less materiality as to the sole aggravating circumstance that the prosecutor was attempting to prove up." He points out that if a different judge had presided over the current case, that judge would not have had any knowledge of the prior case because there was no evidence of it presented at the trial in this case.

To clarify what we are not deciding, we would point out that Lopez has not raised an issue as to whether the sentencing judge impermissibly made factual findings in violation of the Sixth Amendment to the United States Constitution. See *State v. Soto*, 299 Kan. 102, 322 P.3d 334 (2014); *State v. Hilt*, 299 Kan. 176, 322 P.3d 367 (2014). Further, he does not argue that the collateral estoppel component of the Double Jeopardy Clause should bar the State from admitting evidence of his prior acquittal. See *United States v. Watts*, 519 U.S. 148, 156, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997) (applying *Dowling* and finding Double Jeopardy Clause does not preclude sentencing judge from considering issues decided in prior case where defendant was acquitted when the sub-

sequent action was a lower standard of proof); *Dowling v. United States*, 493 U.S. 342, 348-49, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (holding that collateral estoppel component of the Double Jeopardy Clause did not preclude Government from introducing defendant's prior acquittal at trial because Government was presented with lower standard of proof in the later case); 21 Am. Jur. 2d, Criminal Law § 384. The only question that Lopez presents on appeal is whether the evidence of his prior trial in which he was acquitted was relevant to the determination of the appropriate sentence to impose in this case.

*Standard of Review*

Lopez appears to challenge both the probative and materiality components of relevancy. Those components are subject to different standards of review: "Whether evidence is probative is reviewed under an abuse of discretion standard; materiality is judged under a de novo standard." *State v. Bridges*, 297 Kan. 989, Syl. ¶ 2, 306 P.3d 244 (2013).

*Analysis*

Lopez' relevance argument does not take into consideration that K.S.A. 21-4635(c) gives a district court wide latitude with respect to the information it can consider when determining whether to impose a hard 50 sentence:

"In order to make such determination, the court may be presented evidence concerning *any matter that the court deems relevant* to the question of sentence and *shall include* matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4636 and amendment thereto and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received *regardless of its admissibility under the rules of evidence*, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements." (Emphasis added.) K.S.A. 21-4635(c).

In *State v. Richardson*, 256 Kan. 69, 883 P.2d 1107 (1994), the defendant complained that the district court, in sentencing him to a hard 40 life sentence, erroneously allowed the State to introduce irrelevant and prejudicial evidence of a prior crime where the defendant had completed a diversion program and of another crime

where the defendant was not charged. In concluding that the prior crimes evidence was admissible, *Richardson* declared:

"Richardson's contention that evidence of her prior criminal activity is not relevant to any of the aggravating circumstances appears in part to be accurate. However, the legislature authorized the introduction of a broad spectrum of evidence which 'shall include matters relating to any of the aggravating circumstances' but expressly is not limited to matters relating to those circumstances. K.S.A. 1993 Supp. 21-4624(3). In fact, the legislature authorized the introduction of evidence 'concerning any matter that the court deems relevant to the question of sentence.' K.S.A. 1993 Supp. 21-4624(3). The trial court deemed the evidence of prior criminal activity relevant and properly so as to 21-4625(3)." 256 Kan. at 79.

Later, in *State v. Moncla*, 262 Kan. 58, 936 P.2d 727 (1997), the defendant similarly challenged his hard 40 sentence under K.S.A. 21-4635, arguing the district court improperly considered police reports detailing a prior conviction and bad acts. This court followed *Richardson* and "conclude[d] that issues regarding aggravating and mitigating circumstances make up only one portion of the evidence the trial court may consider when making its determination under K.S.A. 21-4635. The trial court did not err when it considered the defendant's prior conviction and bad acts." *Moncla*, 262 Kan. at 78.

Arguably, the prior prosecution may have revealed undisputed matters that a sentencing court would deem relevant to sentencing in the current case, notwithstanding the defendant's acquittal. But the problem, as we see it, is that the district court did not require the State to make a record of the matters it professed to be relevant and the district court should not have effectively taken judicial notice of such unstated facts without giving the defendant an opportunity for rebuttal.

Nevertheless, Lopez does not make a due process argument, and the district court, in pronouncing its sentence, made no indication it was relying on any information revealed at the prior trial. In other words, any error in the manner in which the district court handled the information from the prior trial was harmless. See *State v. Ward*, 292 Kan. 541, 552-65, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (discussing tests for harmlessness).

## WEIGHING AGGRAVATING AND MITIGATING CIRCUMSTANCES

Lopez raises a separate issue challenging the propriety of the district court's weighing of the aggravating and mitigating circumstances. But in essence, he rehashes his complaint about the district court erroneously considering his prior acquittal.

### Standard of Review

For a hard 50 sentence, appellate courts review the district court's weighing of aggravating and mitigating circumstances for an abuse of discretion. *State v. Nelson*, 296 Kan. 692, 694, 294 P.3d 318 (2013).

" 'Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.' *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." 296 Kan. at 694.

### Analysis

As indicated, the State relied on the aggravating circumstance that Lopez knowingly and purposely killed two people. For mitigators, Lopez asserted that his role as an accomplice was a relatively minor one and that he was only age 18 at the time. See K.S.A. 21-4637(d) and (g). When imposing a hard 50 life sentence, the district judge recited:

"In this case, two people were killed. That is an aggravating factor. While I'm aware of the mitigating factors, I am convinced that those mitigating factors do not outweigh the aggravating factor that you participated in a multiple killing.

"That you should be subject to the Hard 50 is, to me, more complex than Mr. Molina, who I also believe was the one who pulled the trigger, taking the lives. But I do believe that as you aided and abetted in these killings, you did so actively in the following fashions:

"There was a time when you could have driven the other way, and you chose to follow the vehicle.

"Then the way you operated the vehicle. According to the evidence, the vehicle was driven to just the right location where gunshots could be fired from that vehicle into the victims' vehicle.

"And then immediately the getaway was made. To me, that puts you in the same class punishment-wise as Mr. Molina and, therefore, since the aggravating factors outweigh the mitigated, mitigating factors, I also require that you spend at least 50 years in prison before you're parole eligible."

Earlier in the sentencing proceeding, the district court noted that Lopez' criminal history page reflected seven entries, including one adult drug conviction and six juvenile adjudications. The juvenile adjudications included charges for aggravated assault and aiding a felony arising from a drive-by shooting in which Lopez drove a vehicle while Molina shot the victim. Pointedly, the district court did not mention anything about the previous acquittal being part of the court's calculus.

Moreover, there was certainly sufficient relevant evidence without the prior acquittal to lead a reasonable person to reach the same result as this sentencing court. "It is well established that "'[w]eighing aggravating and mitigating circumstances is not a numbers game. 'One aggravating circumstance can be so compelling as to outweigh several mitigating circumstances' " or vice versa.' " *Nelson*, 296 Kan. at 695 (quoting *Engelhardt*, 280 Kan. at 144). In short, we find no abuse of discretion and affirm Lopez' sentence.

Affirmed.